## Surles v. The State.

1. One on trial for forgery cannot defend himself by proving his own declarations made in conversations which he had with third persons before the instrument alleged to be forged existed, and at which conversations the ostensible maker of the instrument was not present. Not to exclude such evidence would be to incur the risk of trying the accused by evidence which he may have manufactured beforehand in his own favor.

2. Where the forgery alleged was falsely and fraudulently raising from $5.00 to $85.00 the amount of a promissory note payable in bank, and it appeared that the maker of the note received a written notice from the bank warning him of the day on which a note for $85.00 would mature, and that acting upon such notice he paid off the note by sending the money to the bank, being, according to his testimony, ignorant of the forgery and believing that he was called upon to pay another note for $85.00 which was outstanding in favor of another payee, and there being some question under the evidence whether the notice received from the bank specified the name of the payee of the particular note to which the notice related, it was competent to prove by the clerk of the maker that on receiving the notice he (the maker) inquired of the clerk if such a note as that mentioned in the notice had been given, the maker having testified that the name of the payee was not in the notice, and the evidence of the clerk having a tendency to confirm that theory, and being offered and received in rebuttal to testimony introduced by the accused showing that it was the custom of the bank to specify the payee's name in all such notices sent out.

3. The accused in his statement to the jury at the trial having represented that part of the indebtedness of the prosecutor to him which was embraced in the settlement between them arose by the prosecutor assuming and agreeing to pay a claim which the accused had against the prosecutor's son, it was competent for the State to prove by the son in rebuttal to the statement that neither his father nor the accused had ever made any claim upon him touching the matter, and that he had never heard that the accused considered him as his debtor.

4. The indorsement of two promissory notes, one made in renewal of the other, being rendered somewhat relevant by the prisoner's statement, and the prosecutor having testified in rebuttal to the statement that the real contract was that he was not to be liable on his indorsement of the first note, although that indorsement was absolute, it was competent for him to testify further that he was entrapped into signing the indorsement which the accused

had written on the second note, the accused, when he presented it for signature, saying, "Here it is; it is fixed up; it is not binding on you at all; I don't want it binding on you"; and that the witness, being very busy, looked at it slightly and thought it was without recourse on him, the indorsement being expressed in unusual terms and actually containing the words "with recourse on me," and not the words "without recourse on me." The objection to this evidence made at the trial was, not that it was irrelevant, but that it varied a written contract by parol. This objection was not sustainable, the contract of indorsement being only collaterally in question, and the result of the prosecution being incapable of affecting its force or validity as between the parties, or of varying their respective rights and obligations thereunder.

5. An impeached witness may be sustained by evidence going to his character generally, but not by evidence disproving particular facts brought out on cross-examination of the impeaching witness.

6. Where a witness under cross-examination by counsel for the accused volunteers impertinently to state a fact prejudicial to the accused, all the court can do to remedy the mischief is to withdraw the fact from the jury; and this being done, there is no ground for treating the trial as vitiated, though the witness wandered from the question propounded to him and gave an irrevelant and illegal answer.

7. The weakness of a juror who became ill while the trial was in progress, and the fact that a bed was furnished him on which he reposed during the subsequent portion of the trial, will not require a new trial where his medical attendant deposes that his physical condition did not impair his mental faculties nor unfit him for serving as a juror calmly and dispassionately, and where the juror himself deposes that he was free from pain, that his mental faculties were in their normal condition, and that his mind was no less collected than if he had been in health.

8. That the wives of two of the jurors were seriously ill whilst the trial was in progress, and that both of the jurors ascertained the fact, one of them in an irregular or improper way, is not cause for setting aside the verdict, the explanatory facts showing that the minds of the jurors were not materially disturbed nor under any considerable apprehension on account of the illness of their wives.

9. Whilst it is not absolutely certain that the verdict was correct, the evidence warranted the jury in finding it. And the presiding judge having approved it by denying a new trial, and having committed no error of law, the           *Judgment is affirmed.*

March 31, 1892. Argued at the last term.

Criminal law.  Forgery.  Evidence.  Practice.  Pris-

oner's statement. Jurors. Verdict. Before Judge HARRIS. Coweta·superior court. September term, 1889.

The indictment against W. P. Surles contains several counts, charging him with having altered a genuine note given by J. W. Trammell February 3, 1888, from a note for $5 to one for $85, by inserting the figure 8 before the figure 5 at the top of the note and the word eighty before the word five in the body of the note ; with uttering this altered note to the First National Bank of Newnan, etc. The defendant was found guilty; his motion for new trial was overruled, and he excepted. The evidence was conflicting. Portions of his statement will serve to throw light upon several of the grounds of his motion and upon the nature of much of the testimony. He stated, among other things : In 1884 I got J. W. Trammell and one Bingham to stand my security for $55, was unable to pay the note, and they paid it, each paying half. In 1886 I did work for J. W. Trammell to the amount of $10.30, which I intended to have on the $55 note as a credit as we had agreed. In the fall of 1886 I bought at administratrix's sale some land, and Trammell stood my security at the bank for $200. Trammell's son, John Will Trammell, bought some of the land I had bought, and I made the deed so as to embrace half the parcel I bought and eight acres off the other half. We differed as to the amount there would be in the tract sold ; I contended there was more than thirty-three acres in the tract, so I told John Will I would make the deed and he could pay me enough money to pay off the bank note, and when I had it surveyed off he could pay me the other, as the price was $8 per acre for the amount included in the survey. When the land was surveyed it turned out that John Will owed me for eight and four tenths acres he had not paid for. I made demand on him for it, he refused to pay for it, and in January, 1888, I employed Will-

coxon & Wright to bring suit against John Will for the eight and four tenths acres. Soon after this J. W. Trammell sr. wanted to buy twenty acres of land that my wife had bought on an adjoining lot. I told him he could have it for $300 if he would allow me the free use of it for 1888, etc., which was agreed to. In the sale of the land for $300 I was to pay Trammell what I owed him, and he would give me $115 in cash, provided he could borrow $75 of it from the bank for me, and give me his note for $85, due in the fall of 1888, which added to my account of $100, as Trammell had stated it, would make the $300; that is, my account of $100, cash $115 and his note for $85. At Trammell's request I went to the bank, stated to its president the trade between Trammell and myself and showed him the unexecuted deed that was already drawn up. He told me I could get the money on Trammell's note. I notified Trammell, and he said, "Get the deed executed and bring down to me, and I will comply with the agreement and give the note to the president for $75, and give you $40 cash and a note for $85 due in the fall, and your account which is $100, thereby making the settlement full and complete." The president ordered the cashier to draw a note due November 1, 1888, that would draw $75 cash, which he did, and I took it. It was made for $81.85, payable to the president. I carried it to Trammell and also a note for $85, payable to myself at the bank. Trammell took the deed and signed these two notes, and then was to pay me the $40 cash and my account for $100, but said he did not have the money but would give me his note and add in the bank interest, one per cent. a month. He got his books and said my account to date was $98.85, which included half of the note paid by him and Bingham, and this left him owing me $41.15. I told him, as he could not pay the balance in cash as was the agreement, I wanted him to give me

a note for $5, as I was on a trade with one Houston for a pistol and would have to give him $5 to boot. He gave me the $5 note which left him due me $36.15, and added one per cent. a month for nine months, which made $3.25, and half of the attesting fees for five papers sixty-two and a half cents, and the $36.15, $3.25 and sixty-two and a half cents made forty dollars, two and a half cents, and I took his note for $40, which closed up our transactions for the land sale of $300. He then told me that he would settle the difference between me and John Will Trammell and give me his note, as he had heard I was suing John Will. I agreed to take his note, and he added in the $10.30 he owed me (for labor) to the $62.50 he agreed to pay me for John Will, which made $72.80. I took his note and left it with McWilliams at the request of Trammell, as he wanted to exchange a note he was to get from Mrs. Brown for $72.84 for the one I had on him for $72.80, stating that it would be just as good with his indorsement as the one I had, and that it would leave only one note out when the matter otherwise would leave two notes out. I agreed to do it, and at once notified Willcoxon & Wright that the matter between me and John Will Trammell had been settled, telling them how I had settled. On February 15, 1888, I saw the senior Trammell. He had the note from Mrs. Brown and indorsed it to me, and I got the note from McWilliams and turned it over to Trammell. This note of Mrs. Brown's became due, Trammell got me to agree to renew it, and I took a note from Mrs. Brown payable to him for $91.40, which was the renewal of the $72.84 with two years bank interest and some cost I had paid for Mrs. Brown. Trammell indorsed this $91.40 note to me and I cancelled the $72.84 note, and turned it over to Mrs. Brown. Finding I could not make the trade for the pistol, I turned over the $5 note to Trammell and traded out the amount of it in Trammell's store.

Trammell in his testimony, among other things, denied that he had ever given an $85 note to the defendant; gave a different version as to how the $300, in the transaction for the land which defendant's wife had bought and which was sold to him, was made up ; and denied that the $5 note had ever been turned over to him by defendant, or that he had agreed to or did make any payment to or settlement with defendant as to a dispute between defendant and John Will Trammell about the land transaction between these two, etc., etc.

The motion for a new trial contained the general grounds that the verdict was contrary to law, evidence, etc., and the following special grounds:

1. Error in excluding the testimony of Wright and of his partner Willcoxon, that defendant had told Wright in Willcoxon's presence (neither of the Trammells being present) that defendant had settled the land dispute between him and John Will Trammell, and the details of the settlement, as follows : that J. W. Trammell proposed, if defendant would sell him land belonging to defendant's wife for $300 and take in payment what he owed Trammell, Trammell would give him $62 in compromise of his claim against John Will Trammell about the overplus of the land, that he had accepted the proposition, and that Wright need not file the suit, as the settlement would be consummated in a few days, soon as the papers could be arranged ; and wanted to know what witness's fee would be.   Also, the testimony of one Barnes, who was offered by defendant to prove that defendant, a few days before February 2, 1888, the day the forged note bears date, came into his office and detailed to him the fact that he had sold the land to Trammell and Trammell was to pay him $115 in money and give him a note for $85, payable in the fall, and he was to take in part payment $100 he owed Trammell.

2. Error in overruling defendant's objection to testimony of McWilliams, that when J. W. Trammell received a notice from the bank that the $85 was held by the bank and when it was due, " Trammell wanted to know of me if there was such a note given." The objection to this testimony was, that it was not relevant, defendant was not present and therefore [not] bound by the declaration of others, and that it was hearsay and thus illegal. It may be gathered inferentially from the evidence that McWilliams was employed at Trammell's store, and possibly had charge of the books.

3. The court permitted John Will Trammell to testify that his father had made no demand on him for the amount paid, as defendant claimed, in the settlement for the overplus of the land. Defendant's objection to this testimony was that it was irrelevant and immaterial.

4. The court permitted J. W. Trammell to testify, over defendant's objection, that he did not indorse the $72 note of Mrs. Brown, payable to him, to the defendant, it appearing from the notes that he had indorsed both of them and he not denying he had signed the indorsement, but he was allowed, over objection, to testify as follows : "I looked at this slightly ; it was a busy season of the year. We were buying cotton, and Walter came to me and says, it is fixed. I just looked at it slightly ; I was very busy, and signed my name to this note. I told him twice I would not sign it. I transferred it to him without recourse on me. He said, 'Here it is; it is fixed up ; it is not binding on you at all.' He says, 'I don't want it binding on you ; I want to get these legatees to sign it; they have got so much confidence in you that they won't sign it unless it is transferred to me by you.' We were very busy buying cotton and paying off and collecting money, and I did not have much time to fool with Mr. Surles. I looked at it a moment and thought it was without recourse on me."

The objection to this testimony was, that it was varying a written contract by parol, adding to a written contract by parol proof, which it was not competent to do, as the indorsement was in writing and spoke for itself.

5. The court refused to allow Tom Surles to testify that he had paid certain costs and had a receipt therefor, which a witness, Walthall, who had been introduced to impeach him, had sworn as a reason why his character was not good and why he would not believe him on oath: "that in a case he (the witness) had given judgment against said Surles and he entered an appeal and made a pauper affidavit, and immediately went out and bought a cow and took the money out of his pocket and paid for it." The State objecting, the court would not allow the introduction of the receipt or the witness to testify that it had been paid.

6. The State's counsel introduced a witness, Jackson, by whom they supposed they could impeach Tom Surles, and did, by asking him the usual questions as to Tom Surles, impeach him. On cross-examination, in answer to the question, " Did you know Mr. Tom Surles ?" the witness answered, "I have seen him." Question: "Is this the man ?" (pointing to defendant). Answer: "I do not know whether his name is Tom Surles or not; that is the man I am talking about; the reason I know that man is, he built a house for my mother and ran off with $250." The State's counsel withdrew this testimony, and the court stated that it was out; but the defendant contends it had the effect of prejudicing the jury against him, that his character was never put in issue, and that it was wholly inadmissible, wrong and very damaging to him for such evidence to be introduced.

7. Error in compelling defendant to go on with the trial of the case on Monday morning, over his objection, because one of the jurors who had sworn to try the case

became so ill on the preceding Saturday that the court
suspended the case and took a recess until Monday
morning, at which time the juror, Carmichael, appeared
in court but still so unwell as to be unable to sit up and
hear the case, and was compelled to lie down the bal-
ance of the trial, which continued until after night on
Monday, the juror not sitting up any of that time, but
lying during the reception of the evidence and while
the case was being argued, more than ten hours, on a
bed provided in the jury-box. When the court con-
vened on Monday the court asked the juror if he was
able to go on with the case, to which he replied, he was
he thought, on which the court overruled defendant's
objection and required the case to proceed. Defendant
alleges that it was error to require him to proceed with
the case before a juror who was so sick as not to be able
to sit up and listen to the evidence and hear argument
of defendant's counsel, that he was entitled to a jury of
twelve men, each and all well and physically able to
give the closest attention to all the evidence, the argu-
ment of counsel and the charge of the court, and that
the court erred in permitting a bed to be provided by
the sheriff in the jury-box for the sick juror, and in
allowing the juror to lie down during the trial, from
the time the court convened on Monday morning until
they were sent to their room Monday night to consider
their verdict, for if the juror was too sick to sit up he
was too sick to go on with the case, and if well enough
to sit up, should not have been permitted to lie down,
and such conduct embarrassed the defendant in his de-
fence.

8. The remaining ground is, that the jury was not
such as could properly and legally try defendant, for
not only was the juror Carmichael too sick to properly
consider the case, but two other jurors were so situated
at the time when sworn, which fact was unknown to

defendant, as to be unfit to consider so important a case : Mrs. Jackson, wife of one of the jurors, was extremely ill and at the time and during the trial continued in almost a dying condition, and Mrs. Mixon, the wife of another juror, was in labor with her first child, which wholly unfitted them for giving that attention and consideration to the trial of the case to which defendant was entitled.   And he alleges that by reason of the sickness of the juror and the condition of the wives of the two jurors, the jury was not in condition to carefully, diligently, etc. weigh, consider and analyze the evidence, argument and charge. ' Also, that the verdict is illegal for the reason that, after the case had been submitted to the jury and while it was being tried, the bailiff in charge of the jury permitted Mixon's brother-in-law to ·tell him, in the presence and hearing of Mixon, that Mrs. Mixon was very sick, having tremors, and he (Mixon) must go home, which communication was illegal and tended wholly to unfit the juror properly to try the case.

As to the 7th and 8th grounds the following affidavits were produced : By a physician who during the trial attended Mrs. Mixon, that she was at that time in a very nervous state and so sick as to require the personal attention of Mixon, if she could have obtained it.   By a physician who attended Mrs. Jackson, that she was at that time quite feeble and low, and required the personal attention of her husband.   By a physician, that during part of the term of court he attended Carmichael, that during part of the time the case was in progress Carmichael was very sick and unable by reason of the sickness to sit up, that a person so sick is subject to severe pain at any time during the sickness, that he had so far recovered by Monday morning that, by being permitted to lie on a lounge, he could calmly and dispassionately consider the case, and his physical condition

was not such as to impair his mental faculties, and
affiant considered he was not disqualified from physical
or mental condition to act as a juror.   By one Andrews,
that on Saturday evening during the trial he approached
Haines, the officer in charge of the jury, and on the
street said to him in the presence and hearing of Mixon,
that Mixon's wife was very sick and desired him to
come home, that she wished to see him.   By defendant
and his counsel, that they did not know of the sickness
of the wives of the two jurors until the case had pro-
ceeded to trial and the proceedings were far advanced,
and had no knowledge of the fact that information of
the condition of Mrs. Mixon had been conveyed to her
husband during the trial, until after the verdict was
rendered.   By the sheriff, that he heard Andrews telling
the bailiff, in the hearing of Mixon, that Mrs. Mixon
was very sick and wanted him to come home; that affi-
ant told Andrews not to talk in the hearing of the jury,
and he and Andrews walked off; that he immediately
found Willcoxon, one of defendant's counsel, and Mc-
Clendon, one of the State's counsel, and informed them
of what had taken place, and it was then agreed by
them that the affiant should go to where Mrs. Mixon
was staying, and he found out that it was a spell of
nervous excitement which affected her, and was told by
her mother that she was quiet and that there was no
necessity for Mixon to come; that he immediately re-
turned to the jury and informed Mixon of these facts,
and that if his wife got worse or needed his presence he
should be informed and allowed to go home as the at-
torneys had agreed to it; and that he seemed satisfied
with this. By Willcoxon, that the only agreement made
in the case was, that Mrs. Mixon's brother had told
Mixon, then on the jury in charge of the bailiff, that
she was in convulsions and likely to die, or words to
that effect, which fact being communicated to affiant
v 89 12

and McClendon, they agreed that if Mrs. Mixon should be thought to be dying the sheriff could convey Mixon to see her, but in no other event was he to leave the jury, or be approached or talked to by any one. By the juror Carmichael, that while he was sick he was not incapacitated from doing his duty as a juror; that he began to feel sick Saturday morning, but was not badly affected until the afternoon, at which time the trial was suspended and he was allowed to go home until Monday; that he was very sick while at home, but had so far recovered by Monday as to be free from pain though very weak, and could consider what was being done as if he had been entirely well; that he had every faculty of his mind in as normal condition as if he were well, was easy in body, and his mind was as collected as if he had not been attacked by the disease. By one who witnessed the trial, that during the trial Carmichael became sick; that on the Monday in question Carmichael was apparently very sick and rested upon a bed or couch all day, and seemed to pay no attention to the proceedings, and was apparently asleep on said day, and according to deponent's best knowledge and belief was apparently not a competent juror to try the case. By the juror Jackson, that on Friday evening he heard his wife was sick, but did not know how sick; that he was particularly uneasy about her; that on Saturday evening he was permitted to go home where he stayed until Monday when he resumed his place with the jury; that his wife had a nervous attack as she frequently had, and by Monday morning had so far recovered as to give him no uneasiness; that he was satisfied her illness had no effect on his verdict, as he was in his usual mental condition and could and did carefully, diligently, etc. weigh, consider and analyze the evidence, argument and charge so as to do full justice to defendant. By the bailiff, that Mixon's brother-in-law ap-

proached him and said that Mrs. Mixon was sick and wanted him to come home; that the sheriff came up about that time and said he would see the attorneys about it; that he then carried the jury to the hotel; that the sheriff came back and told him to tell Mixon that the attorneys had agreed for him to go home if his wife needed him, but that he had been over to where she was and she had got over her nervous spell and gone to sleep, and if she got worse he would be allowed to go; that the next morning the jury in affiant's charge walked out near where Mrs. Mixon was, and affiant went to the door and asked how she was, and was told that she was all right, and she walked out to the veranda so he could see her, and again in the afternoon, as the jury were walking out, she was in the yard and Mixon saw her but had no talk with her. By two other jurors, to a similar effect, and that after Mixon's brother-in-law had said that Mrs. Mixon was quite sick, until informed by the sheriff that she was better, etc., Mixon was greatly troubled, but was relieved by that information and was a deliberate, fair and intelligent juror; and that the jurors Jackson and Carmichael were attentive, deliberate and in full possession of their mental faculties.  By Mixon, that he first heard of his wife's sickness from what his brother-in-law told the bailiff, and immediately thereafter the sheriff went to see her and made the statements above mentioned; that with this information he was content and felt entirely at ease, was in as good condition mentally to try and consider the case as at any time during the trial; that he was at no time apprehensive of any serious result from his wife's sickness; that it could not have been more than fifteen minutes from the time he heard of her sickness to the time the sheriff returned as stated; and that while walking with the jury next day he saw his wife, apparently well; that nothing occurred during the trial to

prevent his giving it a fair, candid, intelligent and conscientious consideration; and that he did so, and his mind during the trial was in its normal condition and he was in full possession of all his faculties.

P. H. BREWSTER, WILLCOXON & WRIGHT and P. F. SMITH, for plaintiff in error.

T. A. ATKINSON, solicitor-general, by brief, *contra.*